**MEAFATU ALA, Plaintiff,**

**v.**

**AMERICAN SAMOA GOVERNMENT, Defendant**

High Court of American Samoa
Trial Division

CA No. 133-95

August 18, 1998

Before RICHMOND, Associate Justice, and LOGOAI, Associate Judge.

Counsel: For Plaintiff, Jennifer L. Joneson
For Defendant, Gwen F. Tauiliili-Langkilde, Assistant
Attorney General

## OPINION AND ORDER

Plaintiff Meafatu Ala ("Ala") filed this action for damages against defendant American Samoa Government ("ASG") resulting from a slip and fall accident on ASG's premises on April 28, 1995. ASG claimed sovereign immunity in a motion for summary judgment. The court denied the motion without prejudice to develop this defense further at

trial. The trial began on April 9 and concluded on April 14, 1998.

## Facts

The premises at issue is a restroom in Lions Park ("the restroom"), a public park managed by ASG's Department of Parks and Recreation ("DPR"). ASG designed and installed the restroom. The restroom is of concrete block construction. It has two separate toilet rooms accessible by a single front entrance, which is closed by a steel bar door when locked.[1] The two separate toilet rooms are windowless. They do not have electric light and are illuminated only by daylight around the eaves and above the block wall immediately behind the front entrance. The two separate toilet rooms are not marked with "men" and "women" signs.

DPR maintains the restroom, along with the restrooms at the golf course, baseball field, public market, and four other public parks. The crewmen, usually two, are scheduled to open and clean the restrooms daily, beginning between 5:30 and 6:00 a.m., and to close them, between 5:00 and 6:00 p.m. The crewmen normally start at either the most easterly or westerly facility and move in the order of locations to the other end. However, if a location is reserved by a particular group for use at a particular time, the crew will adjust the schedule to accommodate the group. The cleaning routine includes sweeping, hosing, and scrubbing the restroom floors. Supervisors check the restrooms, as their schedules permit, and, if necessary, require the crew to return to clean them. When the restrooms are closed for an extended time, checks are also sporadically made to ensure that the restrooms remain locked. This maintenance program is apparently not formalized in writing.

The lead crewman testified that on Friday, April 28, 1998, the date of the incident, the crew did the maintenance work at the restroom in question at about 10:30 a.m. and the light inside was sufficient to see the floor. The maintenance routine, however, was not logged. A written statement concerning the incident was prepared in November 1995 for the lead crewman to sign. The statement essentially described the cleaning routine and provided that the lead crewman saw no evidence of an accident. By signing the statement, the lead crewman also fixed the incident date, apparently suggested to him, as Thursday, April 27. These factors, coupled with his demeanor as a witness, clearly demonstrated that the lead crewman did not have truly independent recollection of his

---

[1] The entire building has four separate toilet rooms. The two rooms involved occupy the *mauga* side of the building. The other two toilet rooms occupy the *sami* side of the building, towards the tennis courts. These second two toilet rooms have separate entry doors and are maintained by the American Samoa Tennis Association.

workday events or activities in late April 1995 and specifically on April 28.

The restrooms at Lions Park were also occasionally vandalized during the time period of the incident. Locks and lock chains are sometimes broken or destroyed and taken, leaving the restrooms open until repairs are made.

On April 28, 1995, between 10:30 and 11:00 a.m., the restroom was unlocked and open. Ala stopped to use the restroom on his way home from a customary Friday golf game. He hesitated at the initial entrance to look for "men" and "women" signs. Seeing none, he entered one of the two toilet rooms. The floor in this toilet room was wet and dirty from water, human waste, and debris. The human waste odor was very strong. Ala, however, did not see the slippery condition of the concrete floor or take special note of the odor before he entered the toilet room and fell. Ala's eyes probably had not adjusted to the reduced lighting in the unlit room before he fell. He slipped at his second step inside and fell to the floor, striking his left side. He was rendered unconscious for a time from the fall.

Ala's wife was waiting in their vehicle for him. Concerned at the length of time Ala remained in the restroom, his wife went into the restroom to check on him. She found Ala on the floor, unconscious, wet with water and urine, and smeared with excrement containing crawling maggots. When he regained consciousness, Ala could not move his left arm. He was in severe pain. His wife assisted him to stand and took him home. Because of the intense pain from the swelling and abnormal position of his left arm, Ala could not remove his shirt by himself. His wife and son cut off the shirt and cleaned Ala's body. Later, his son and another man pulled Ala's arm into place. Ala visited a Samoan *fofo* that day and went to ASG's LBJ Tropical Medical Center ("LBJ") the next day.

Ala dislocated and broke his left shoulder in the fall. He also injured his back and neck. The testimony given by both Ala and Dr. John H. Bannister ("Bannister") clearly shows that these injuries resulted from the fall.

ASG sought to disqualify Bannister as an expert witness. At the time of the trial, Bannister was chief of surgery at LBJ. He received his medical degree in Australia in 1964 and a fellowship in surgery ("F.R.C.S.") in England in 1972. In 1992, however, an appointed medical tribunal of New South Wales investigated six complaints against Bannister, and found him "guilty of professional misconduct" with respect to surgical care in two cases in 1986 and for "improper or unethical conduct" and being "not of good character" for charging "phantom visits" from 1985

to 1990. The medical tribunal considered a reprimand sufficient punishment for the surgical cases, but based on his unethical charging practices, the tribunal directed that Bannister be deregistered from the practice of medicine in Australia. Since then, Bannister has not been registered in Australia but has practiced medicine in Saudi Arabia and in American Samoa. Bannister applied for an American Samoa license but, as of the time of this trial, had not yet been issued a license.

We admitted Bannister's expert testimony on the diagnosis and treatment of Ala's injuries, subject to thorough review of his background. Bannister has the prescribed medical education as well as lengthy experience in orthopedic practice. Since his deregistration was principally based on lack of good character in management matters, we do take his testimony, along with Ala's testimony, into account.

Ala still experiences stiffness and pain in his left shoulder and pain and numbness in his left arm. He has difficulty lifting heavy objects and cannot move his left arm more than 60 degrees above horizontal. He has degenerative conditions in the cervical spine, neck pain with related pain in both arms, and neck movement limited to 50% of the normal range. He has disc pathology at the site of the pain in his lumbar spine, a sciatica condition with associated pain in the lower back, left hip, and down his left leg. Spinal mobility, related to the diseased disc, some spinal deformity, and lower back pain, is also restricted to about 50% of the normal range. Bannister examined Ala in August 1997 and found all these medical conditions attributable to Ala's fall in 1995.

Ala will suffer from these conditions permanently. He gains some temporary relief from manipulation of his back and shoulder. In August 1997, Bannister administered back manipulation and a depomedral injection in Ala's spine under general anesthesia. This treatment provided relief from the sciatica condition. However, the pain caused by this condition was recurring at the time of the trial. Surgical removal of the diseased disc and spinal fusion may be necessary to achieve long-term relief from the sciatica condition.

Ala was not free from preexisting conditions at the time of the fall. His left shoulder was injured in a vehicular accident in 1968. He suffered a stroke in 1991 with temporary left-side paralysis. In 1993, Ala may have fallen in a bathtub or shower accident, striking his left side, but he apparently does not recall this incident now. Left shoulder pain was recorded by LBJ in 1969 and four times in 1991, and lower back pain in 1990 and 1994. During a Social Security medical disability examination in 1994, the examining physician noted Ala's mild stroke; diabetes; left shoulder, hip and leg pains; restricted left shoulder movement; about 30% decreased strength in his left hand; walking imbalance due to a very

mild left-foot drop; lower back tenderness; and disc pathology at the same spinal location presently at issue with other associated degenerative changes.

Bannister opined, giving reasons, that these earlier events and preexisting medical findings were either unrelated to or consistent with his medical findings in 1997. He believes that Ala's injuries from the vehicular accident in 1968 were sustained when Ala's chest struck the steering wheel and are essentially unrelated to Ala's injuries from the fall in 1995. He seems to ignore, however, the LBJ notation in 1991 of a left shoulder injury from this accident. He also believes that Ala's several left shoulder complaints in 1991 were related to Ala's stroke or his plantation work, and are different in nature from Ala's complaints after the fall in 1995. He further believes that since Ala's complaints in 1990 and 1994 included chest pain as well as lower back pain, these symptoms were more likely caused by viral infections. Finally, he believes that Ala's preexisting medical conditions recorded in the 1994 examination do not contradict the effects of the fall in 1995.

### Discussion

A. Sovereign Immunity

■ ASG reasserts governmental sovereign immunity as a first line of defense. ASG essentially argues that Ala's claim is based on alleged deficiencies in the design, construction, and maintenance of the restroom, which are discretionary functions excepted in A.S.C.A. § 43.1203(b)(2) from the waiver of sovereign immunity by the "Government Tort Liability Act." A.S.C.A. § 43.1203(b) (2) reads:

> (b) The provisions of this chapter do not apply to:
>
> . . . .
> (2) any claim based upon the exercise or performance of, or the failure to exercise or perform, a discretionary function or duty on the part of an officer or employee, whether or not the discretion involved is abused;

■ The major United States Supreme Court decision in this area, *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 19 L.Ed. 1427 (1953), held that government conduct at the planning stage should usually be considered discretionary, while the actions government specifically undertakes to carry out its programs and policies should usually be considered operational. *See also Savage v. Am. Samoa Gov't,* 1 A.S.R.2d 103, 105 (Trial Div. 1983); *Hansen v. City* of *Audubon,* 378 N.W.2d 903, 904-05 (Iowa, 1985). The Supreme Court later held that only governmental action based on considerations of public policy is

168

considered discretionary. *Berkowitz v. United States,* 486 U.S. 531, 546-47, 108 S. Ct. 1945, 100 L.Ed.2d 531, 546-47 (1988).

■ ASG mischaracterizes Ala's claim. The claim is not based on either the design or construction of the restroom. Design features are part of the relevant fact mix but not the basis of the alleged liability. The absence of "men" and "women" door signs was a minor factor, and the lack of electrical lighting was a significant factor. However, the claim does not involve the design decision on these matters. Rather, the claim is based simply and solely on improper cleaning maintenance of the toilet room. Restroom cleaning does not involve any executive decision making at ASG's policy or program level. It is an operational, non-discretionary function of ASG to carry out on a daily or other similarly frequent routine.

We hold that sovereign immunity is not a viable defense for ASG in this action.

B. ASG's Tort Liability

1. Liable to Same Extent as Private Parties

■ We next address the tort liability issue. When sovereign immunity is waived, ASG "is liable . . . in the same manner and to the same extent as a private individual under like circumstances." A.S.C.A. § 43.1203(a). ASG is responsible for the negligent act or omission of any ASG employee who is acting in the course and scope of his office or employment. A.S.C.A. § 43.1209(a). Restrooms under DPR's management must be properly maintained for public use. A.S.C.A. § 18.0213. Except for this general statutory direction and DPR's informal restroom maintenance program, American Samoa is without relevant statutory or administrative direction, whether alike or different, on the tort liability of public and private possessors of land. Thus, in essence, non-statutory principles of tort liability for either public or private possessors of land are applicable and determinative in this case.

2. Strained Common Law Classifications

The common law categorized persons injured while on another's land as invitees, licensees, or trespassers and adopted particular rules on the duty of care owed to each group in the analysis of imposing tort liability for the injury on the possessor of the land. *See Rowland v. Christian,* 443 P.2d 561, 564-65 (Cal. 1968).

The conceptual distinctions between these three classifications and the duty owed to each group were originally clear cut. *Id.* at 565.

The difference between licensees and invitees, however, became blurred, confused, strained, and complex over time, as courts dealt with situations where the possessor of land should be obligated, for humanitarian and other social reasons, to exercise due care for the protection of persons on the land who did not neatly fit into the rigid concepts of the traditional licensee or invitee categories. *Id.* at 565-69.

Ala would not be a classical invitee, because he was not a business visitor "invited or permitted to enter or remain [in the restroom] for a purpose directly or indirectly connected with business dealings" with ASG. *Rowland,* 443 P.2d at 565; *see also* RESTATEMENT (SECOND) OF TORTS § 332 (3). He might be a public invitee, because he was a person "invited to enter or remain [in the restroom] as a member of the public for a purpose for which [the restroom was] held open to the public." *See* RESTATEMENT (SECOND) OF TORTS § 332(2). This class is one of the modern-day adaptations of the classical invitee concept created to fit particular fact situations. *See O'Keefe v. South End Rowing Club,* 414 P.2d 830, 836 (Cal. 1966)

He might also be a traditional licensee, because he was a person who was not a business invitee but was "privileged to enter or remain [in the restroom] by virtue of [ASG's] consent." *See Rowland,* 443 P.2d at 565; *see also* RESTATEMENT (SECOND) OF TORTS § 330.

It is conceivable, even if only barely, that he might even be considered a trespasser, because he was a person who was without any privilege to enter or remain in the restroom. *See Rowland,* 443 P.2d at 565; *see also* RESTATEMENT (SECOND) OF TORTS § 329.

The difficulty in this case with applying a non-occupant label on Ala stems from the lack of credible direct evidence on the precise way the front entrance to the restroom happened to be unlocked and open on April 25, 1995, between 10:30 and 11:00 a.m. DPR employees may have routinely opened the entrance that morning and have either not cleaned the toilet room or not cleaned it properly. DPR employees may have opened the entrance the day before or several days before April 25, with or without proper cleaning, and not closed and locked the entrance at day's end. In any of these scenarios, Ala would be a non-traditional public invitee. A vandal may have broken the lock and left the entrance open that morning or at some earlier time, in which case Ala could be either a public invitee or a licensee.

■ We agree with the *Rowland* court that the classifications of invitee, licensee, and trespasser have little direct bearing on such tort law considerations as

170

the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

*Rowland,* 443 P.2d at 564. A land occupant's duty of care should be based on ordinary principles of negligence. *See Id.* at 568-69.

3. Duty of Ordinary Care

■ When a reasonably prudent person under the same or similar circumstances should have foreseen the risk, ASG as the owner of Lions Park and the restroom is under a duty to exercise ordinary care in the maintenance of these premises in order to avoid exposing persons to an unreasonable risk of harm caused by unsafe conditions on its premises. *See* CALIFORNIA JURY INSTRUCTIONS—CIVIL (8th ed.), BAJI No. 8.01 (1997 Revision). Breach of this duty is negligence, giving rise to ASG's liability for damages for injuries proximately caused by the breach. *See* BAJI No. 8.00.

On April 25, 1995 between 10:30 and 11:00 a.m., Ala as a member of the public, was greeted with an open-door invitation, or at least permission, to enter the restroom. The floor in the toilet room within the restroom where Ala fell was then in a perilous, slippery condition. The risk of harm from this condition to persons entering the toilet room could be readily remedied by ASG's employees and was thus unreasonable. *See* BAJI No. 8.02. The risk of harm to such persons was certainly foreseeable. ASG had the duty to exercise ordinary care to prevent injury to these persons.

■ Ordinary care is that care which persons of ordinary prudence would use to preclude injury to themselves or others under these or similar circumstances. *See* BAJI No. 8.01. When the unreasonable and foreseeable risk is the product of a dangerous condition, the duty of ordinary care is breached if the owner had knowledge of the dangerous condition or if the condition existed for such a length of time that the owner, by using reasonable care in inspecting the premises, would have discovered the condition in time to remedy it or to give warning before the injury occurred. *See* BAJI No. 8.20; *see also Bridgman v. Safeway Stores, Inc.,* 348 P.2d 696, 698 (Cal. 1960). Knowledge of a dangerous condition acquired by an owner's employee in the course and scope of

171

his or her employment is imputed to the owner from the time the employee created or discovered, or should have discovered, the condition. *See* BAJI No. 8.21; *see also Hatfield v. Levy Brothers,* 117 P.2d 841, 845 (Cal. 1941).

 The floor in the toilet room where Ala fell was wet and dirty from water, human waste, and debris. Maggots were present. Given these circumstances, this dangerous, slippery condition existed for a substantial period of time. DPR employees either created the condition by failing to clean or properly clean the floor, or they had ample time to discover and correct the condition before Ala was injured. Thus, ASG breached its duty of ordinary care to avoid endangering Ala from harm. A legal cause of an injury "is something that is a substantial factor in bringing about an injury." BAJI No. 3.76. Ala would not have been injured but for ASG's negligent breach of its duty to him.

We conclude that ASG is liable in damages to Ala for his injuries from the fall.

## C. Contributory Negligence

 ASG maintains that even if it is liable to Ala, Ala was so contributorily negligent that he is entirely barred from recovery of damages under the comparative negligence doctrine. American Samoa adopted this doctrine by statute. A.S.C.A. § 43.5101; *see Masania`i v. Tedrick,* 2 A.S.R.3d 142, 144-145 (Trial Div. 1998).

 When a plaintiff's negligence is a contributing cause in bringing about the injury, the plaintiff can only recover damages in an amount proportionate to the defendant's negligence. A.S.C.A. § 43.5101; *see also* BAJI No. 3.50. The damages must be reduced in this manner and may even be eliminated in an appropriate case.

 ASG argues that Ala was contributorily negligent, because the slippery floor was an obvious condition that Ala could, and should, have discovered by the ordinary use of his senses. We disagree. The slippery floor was obscured by the dim natural lighting in the toilet room, especially compared to the daylight outside. Ala did not rush into the toilet room where he fell but approached and entered the room cautiously. Ala was not contributorily negligent.

We conclude that Ala's damages will not be diminished under the comparative negligence rule.

## D. Damages

Ala is entitled to reasonable compensation for the substantial pain, discomfort, fears, anxiety, and other mental and emotional distress that he suffered, and will likely still experience, as a result of the injuries he sustained to his neck, lower back, and left shoulder in his fall on April 28, 1995.

 Clearly, Ala had medical conditions and partial disabilities with respect to his neck, lower back, and left arm and side that existed before his fall. Unmistakenly, however, he suffered additional injuries from the fall that aggravated these preexisting conditions and disabilities. While he may not recover damages for preexisting conditions and disabilities, he is entitled to recover damages for the exacerbation of them attributable to the fall. *See* BAJI No. 14.65; *see also Ng v. Hudson,* 75 Cal. App.3d 250, 255, 142 Cal. Rptr. 69, 72 (1977)
We set Ala's damages for pain and suffering resulting from the fall in the sum of $35,000.

### Order

ASG shall pay Ala $35,000 in damages, plus usual costs of suit.

It is so ordered.

